JAMES F. HALLIGAN, Appellant, v. IOWA STEAM LAUNDRY COMPANY et al., Appellees.

PRINCIPAL AND AGENT: ''Ratification by Accepting Benefits''—
1  Nonapplicability of Principle—Collateral Holder—Burden of Proof. One who holds property as collateral security does not, on the theory of ratification by accepting benefits, become responsible for the unauthorized false representations of the real owner in effecting a sale of the property *for his* (the real owner's) *own benefit,* simply because such collateral holder receives the purchase price of the property and applies it on the debt due him from the real owner. The principle ''that the *real beneficiary* of an unauthorized transaction, by accepting the benefits thereof, adopts as his own the rascality employed in consummating it'' has no application to such collateral holder, receiving and applying the proceeds of the sale, unless the sale was in reality *for his benefit.*

PRINCIPLE APPLIED: One Keeler, by means of false representations, sold certain corporate stock and the proceeds were paid to and retained by one Halligan, who knew nothing about the false representations. The purchaser brought action against Halligan for damages, claiming that the stock bought by him belonged to Halligan, and that Halligan was the principal and Keeler his authorized agent. This last claim the purchaser was unable to prove; so he relied on the proposition that the act of Halligan in receiving and retaining the proceeds of the sale was a ratification of Keeler's unauthorized act. At the time of the sale, Halligan did hold this stock, either by direct issuance to him or by indorsement to him by Keeler. Halligan claimed that

all the stock held by him belonged in fact to Keeler and that he, Halligan, simply held it as collateral security for a debt owing to him by Keeler. *Held,* the pivotal question was, not whether the purchaser knew before he parted with his money anything about Halligan's holding the stock as collateral, but whether the sale was really made *for Halligan's benefit,* and that the burden of proof was on the purchaser to show such fact. If Keeler was the beneficiary *of his own bargaining,* then the receipt of the proceeds of the sale by Halligan, and the act of Halligan in applying it on the debt due him from Keeler, furnished no basis for ratification by Halligan.

**FRAUD: Value of Property—Damages—Reliance on Representations**
2 **—Evidence to Rebut.** In an action for damages for false representations in the sale of property (corporate stock) the defendant may show that the property was in fact worth more than the purchaser paid, because tending to show (a) that the purchaser was not damaged, (b) that no fraud poisoned the representations, and (c) that the purchaser did not rely on the representations.

**FRAUD: Corporate Stock—Value—Bills Receivable.** In an action
3 for damages for false representations in the sale of corporate stock, after negotiations had pended for six months, the defendant may very properly show the bills receivable of the corporation at the time of the sale, as bearing on the value of the stock.

**FRAUD: Principal and Agent—Individual Promise by Agent—Ex-**
4 **isting Facts.** A principal cannot be held liable, in an action for false representations, for the statements of his agent in the nature of promises as to what he, the agent, and others would individually do. This drops far short of the rule requiring an assertion of an existing fact.

PRINCIPLE APPLIED: It was claimed that an agent, by false representations, sold certain corporate stock for and on behalf of the principal. The representations alleged were that the principal would, if the sale was effected, retire a certain amount of his stock, and also that a certain amount of stock held personally by the agent and by another person would be retired. *Held,* the latter statements as to what the agent and the other person would do in the way of retiring stock furnished no basis for holding the principal.

*Appeal from Scott District Court.*—HON. WM. THEOPHILUS, Judge.

MONDAY, JUNE 21, 1915.

THE case here presented is upon a counterclaim by the defendant against the plaintiff for damages for alleged false representations for the sale of corporate stock. There was a verdict for the defendant for the amount claimed in his counterclaim and the plaintiff appeals.—*Reversed.*

*Sharon & Higgins,* for appellant.

*T. A. Murphy, A. G. Sampson,* and *Cook & Balluff,* for appellees, Iowa Steam Laundry and Wm. Pohlman, Jr.

EVANS, J.—The only issue tried in this case was upon the counterclaim of defendant Wm. Pohlman. The other defendants whose names appear in the title of the case may be wholly disregarded. By his counterclaim, the defendant Pohlman averred that in August, 1908, he purchased of the plaintiff certain corporate stock in the Iowa Steam Laundry Company and that he was induced to make such purchase by certain false representations made to him by another stockholder, Charles A. Keeler. He averred that such representations were made by Keeler as agent for the plaintiff. The defense was a general denial and a special denial of Keeler's agency and an averment that the plaintiff held the stock in question only as security for certain liabilities of Keeler to the plaintiff and that Keeler was the real or equitable owner of the stock. The alleged false representations are set forth in the counterclaim as follows:

"2. That said James F. Halligan, by and through his said agent, Charles A. Keeler, represented to this defendant that there were no debts of said Iowa Steam Laundry Company except certain notes at the Iowa National Bank and a few small unpaid installments on a certain mangle in said laundry and a few small unpaid installments on a cash register in said laundry, none of which said installments were due. That said James F. Halligan was secretary and treas-

urer of the Iowa Steam Laundry Company and, as such officer, charged with the duty of keeping the books and accounts of said company. That said James F. Halligan, through his said agent, Charles A. Keeler, exhibited the books which purported to be and contain the complete accounts of said Iowa Steam Laundry Company, showing the earnings of said company, its indebtedness and its accounts receivable, together with all other financial data affecting the condition of said Iowa Steam Laundry Company. That this defendant was, and is, a competent accountant and examined the books, so exhibited to him, carefully, and that said books did not show any indebtedness of said Iowa Steam Laundry Company. The said James F. Halligan further stated and represented to defendant that the total outstanding capital stock of said company amounted to fifty-four shares held by said Halligan, seventy-eight shares held by Charles A. Keeler and ten shares held by Hugo Moeller, and that if defendant would purchase fifty (50) shares of the stock of the said Halligan, at par, the said Halligan, Keeler, and Moeller, who held and owned all of said stock of said Iowa Steam Laundry Company, would cancel four (4) shares of stock belonging to James F. Halligan, twenty-eight (28) shares of stock belonging to Charles A. Keeler, and ten (10) shares belonging to Hugo Moeller, so that this defendant would be the owner of fifty (50) shares of stock in said company, Charles A. Keeler would own fifty (50) shares, and said one hundred (100) shares would represent the total outstanding stock of said Iowa Steam Laundry Company."

The breach charged was that there was additional indebtedness against the corporation other than that represented, to the amount of about $900, and that the plaintiff failed to retire the ten shares of stock of Moeller, which were of the value of $1,000. The laundry company in question was actually operated by Keeler in the city of Davenport. Halligan was a resident of the same city, but was engaged

in other business. Prior to March, 1907, the stock issue consisted of 84 shares, at a par value of $100 each, and these were owned in equal parts by Keeler and one Lucas. The testimony on behalf of plaintiff disclosed that in March, 1907, he purchased the shares of Lucas at the request of Keeler and that he advanced certain moneys for the use of the corporation, for all of which Keeler agreed to indemnify him. The 42 shares of Lucas were reissued to the plaintiff Halligan, and the 42 shares of Keeler were indorsed to him by Keeler; so that he held the entire issue of stock as security. The preliminary negotiations for the purchase of shares of stock by Pohlman were had between him and Keeler alone. These began in February, 1908. They resulted in more or less of an examination of the affairs of the company by Pohlman. It is not claimed that any false representation was ever made by Halligan personally, nor is there any evidence of any knowledge on his part that false representations had been made by Keeler. At the time of these preliminary negotiations, the issue of stock had been increased to meet the amount of additional investments made, the total number of shares at this time being 142. Of these shares, 54 were issued in the name of Halligan and 78 in the name of Keeler. The Keeler shares, however, were held in whole or in part by Halligan as alleged security under his contract with Keeler. The understanding between Keeler and Pohlman, according to Pohlman's testimony, was that Pohlman should buy the "50 shares of Halligan" at par, and that the other 4 shares of Halligan and the 10 shares of Moeller and 28 of the shares of Keeler should all be retired and that the stock issue should thereby be reduced to 100 shares. There is no claim that Halligan personally had anything to do with this arrangement or had any personal knowledge of it. On July 27, 1908, Pohlman, either alone or with Keeler, went to see Halligan and advised him of the price agreed on between Keeler and Pohlman; $50 was paid on that day to Halligan. Later, on August 4th, $2,450 was paid to Halligan, and Pohlman

executed his note to him for the remaining $2,500. Halligan thereupon surrendered all the stock under his control. According to testimony in his behalf, the amount due him, under his arrangement with Keeler for money actually advanced, was about $5,700. He was under liability to pay upwards of $2,000 more, which he later paid. He put the $5,000 received to the credit of Keeler and looked to him personally for the balance. The question of balance due him from Keeler was later litigated between him and Keeler and the finding was in his favor. As to the first interview with Halligan, Pohlman testified as follows:

"When I went to see Mr. Halligan, well naturally, when I came there,—I don't remember just exactly, but I know that he told me that probably it was a bad proposition in a way, but he thought it would be a good thing for some young German to come in there and try to boost the business up in a way, I told him I had spoken with Mr. Keeler and that Keeler told me to come up there and make a payment on this for to bind the deal. He gave me a receipt for it. He said they had a chance—that Crook Brothers were figuring on buying them out because they were not doing the way they might do, or ought to do, and if I got in there—and he said that I was up against a kind of a tough proposition, because they were pretty hard competitors, but he hoped I would come out all right. I discussed the details at that time with him. As near as I can remember that discussion was, after we got ready when the deal was closed, I was to pay the $2,450 and give him a note for $2,500. I don't remember what we spoke about, maybe different little things, I don't remember anything in particular. I don't remember of ever having had a talk with Mr. Halligan about the terms of this sale, etc., before this time. Before the time I went to see Mr. Halligan at the time I paid him his $50, I had reached an agreement with Keeler as to the amount I should pay for Halligan's stock and the terms upon which I was to pay for

it. When I went to see Mr. Halligan at that time, I told him I had reached such an agreement. He said it was satisfactory to him.''

I. One of the important questions in the case was as to whether Keeler could be deemed the agent of Halligan in the making of the alleged representations complained of.

1. PRINCIPAL
AND AGENT:
"ratification
by accepting
benefits": non-
applicability
of principle:
collateral
holder: bur-
den of proof.

The trial court instructed the jury that the burden was upon Pohlman to prove that Keeler was the authorized agent of the plaintiff in making such representations, or else that Halligan had afterwards ratified the assumed agency of Keeler. As already indicated, there was no evidence that Keeler was in fact the authorized agent of Halligan; nor was there any evidence of ratification except the ratification that might be implied by the fact that Halligan actually received the purchase money of $5,000, under the rule of *Eadie v. Eshbaugh*, 44 Iowa 519, and like cases. This rule was laid down by the trial court in instruction 10, as follows:

''10. Ratification is shown when one, after learning all the material facts, accepts the unauthorized acts of another in his behalf, or it may be shown when one receives, accepts and keeps the benefits or proceeds derived or resulting from the unauthorized acts of another in his behalf. When he receives, accepts and keeps such benefits or proceeds, he thereby ratifies and adopts as his own the acts of that other in regard to the matter in hand the same as if done by himself.''

Instruction 11 also contains the following:

''It appears without dispute that Halligan has received and accepted and kept the $5,000.00 proceeds derived and resulting from the sale to Pohlman.''

As bearing upon the question of whether Halligan held the stock as collateral security only, instruction 7 was as follows:

"7. There are two preliminary propositions to be de-
cided before proceeding farther: First. Did the 50 shares of
stock sold to Pohlman belong to Halligan, or did Halligan
hold same as collateral only? And if found that same was
only held as collateral security, then did Pohlman have any
knowledge or notice thereof before he paid the $50.00 on
the deal? These questions are for you to answer from all
the evidence in the case.

"If found that the stock sold to Pohlman belonged to
Halligan, or if found that he held it only as collateral secur-
ity, but that Pohlman had no knowledge nor any notice there-
of before he paid the $50.00 on the deal, then you may proceed
to consider the second preliminary issue or proposition,
namely: Was Keeler the agent of Halligan in the sale of
the stock to Pohlman?

"But should you find, however, that Halligan held the
stock as collateral security only, and that Pohlman had knowl-
edge or any notice thereof before he paid the $50.00 on the
deal, you need consider the case no farther; and in that event
you should return a verdict for the plaintiff.

"(c) If you believe from the evidence that Halligan was
not the owner of the stock sold to Pohlman, but only held it
as collateral security, and you further find that Pohlman
had knowledge or notice thereof before the $50.00 was paid
on the deal, then your verdict must be for the plaintiff."

It will be noted from the foregoing that the court laid
upon Halligan the burden of showing not only that he was
not the real owner of the stock and was not the real benefi-
ciary of the contract, but of showing also that Pohlman had
notice of that fact. The rule of ratification announced in the
*Eadie case* is one of legal implication. It is implied on the
theory that, when the alleged principal is the real beneficiary
of the contract, he shall not enforce the contract in his own
behalf while repudiating its considerations. He must, there-
fore, either reject the benefits or be deemed to ratify the

agency. Manifestly, the rule would not be applicable if Keeler was himself the principal and the beneficiary of his own bargaining. The benefits to Halligan would be indirect and consequential only. The proceeds received by him were necessarily applied upon the obligation of Keeler. This was .done in ignorance on his part of any false representations by Keeler. This distinction was recognized in the instructions, with the qualification that notice to Pohlman must be proved. The trouble is with this qualification. The burden was upon Pohlman to prove the authorized agency, either by previous arrangement and intent of the parties or by subsequent ratification. The only form of ratification contended for was that the contract was made for his benefit and that he received the benefit. This was a question of fact. Halligan, by his testimony, denied it in the manner indicated. The burden of proof of the ratification was upon Pohlman. Successful denial of .the fact relied on was sufficient to defeat claim of ratification. It was the fact itself which was material here, and not Pohlman's knowledge or want of knowledge of it. If, therefore, Halligan successfully refuted the claim that he was the real beneficiary of the contract, it was error to lay upon him the additional burden of proving that Pohlman knew that he was not such beneficiary.

2. FRAUD: value of property: damages: reliance on representations: evidence to rebut.

II. The plaintiff offered to show that the value of the stock of the laundry company was greater than the amount paid for it by Pohlman. Evidence along this line was rejected and error is assigned thereon. We think the evidence was admissible for two reasons:

(1) Because the counterclaim pleaded the measure of damages as follows:

"The capital stock which defendant purchased from said James F. Halligan would have been worth the sum of five thousand dollars ($5,000), which this defendant paid therefor. That under the facts hereinbefore stated and under the actual facts existing, said shares of stock of the said James

F. Halligan were not worth the sum of five thousand dollars ($5,000), but the value of said shares was reduced by one-half of the indebtedness of said company, amounting to four hundred and fifty-four and thirty-two one-hundredths dollars ($454.32), and by one-half of the amount paid to Hugo Moeller for his stock, amounting to five hundred dollars ($500). Said capital stock being worth nine hundred and fifty-four and thirty-two one-hundredths dollars ($954.32) less than it would have been worth had the representations of the said James F. Halligan, made through his said agent, Chas. A. Keeler, been true.''

(2) Because the evidence was admissible as bearing upon the question both of fraud in the representations and in the reliance of Pohlman thereon. The question is analogous to that involved in *Likes v. Baer,* 10 Iowa 89; *High v. Kistner,* 44 Iowa 79; *Vaupel v. Mulhall,* 141 Iowa 365.

The plaintiff attempted to show the bills receivable held by the company at the time of the transfer, and this line of evidence was rejected. When it is remembered that the nego-

3. FRAUD: corporate stock: value: bills receivable.

tiations between Keeler and Pohlman began in February and were not consummated until August and that the company was a going concern, it goes without saying that the identity of its bills receivable and its liabilities would change more or less in the meantime. We think the ruling of the trial court was too close at this point and that the parties should not have been confined to a consideration of the mere items of corporate liability as specified in the claim.

III. It will be noted that one of the alleged false representations was that Halligan, Keeler and Moeller would retire certain shares of stock held by each one and that this repre-

4. FRAUD: principal and agent: individual promise by agent: existing facts.

sentation failed by the failure of Moeller to retire his 10 shares. We find no evidence that would justify the charging of this representation against Halligan by Keeler as an alleged agent. A part of this representation as pleaded in the coun-

HALLIGAN v. LAUNDRY .CO.     [170 Iowa

terclaim was that Keeler would retire 28 shares of his stock and that Halligan would retire 4 shares of his stock. Halligan did retire or surrender all the stock which he, in any manner, controlled. Surely, it could not be claimed that Halligan was responsible as principal if Keeler had failed to retire his own 28 shares of stock. There is no ground for saying that Keeler was doing other than speaking for himself as to such 28 shares of stock. Nor can we see any ground for saying that he was speaking for anyone but himself and Moeller if he assumed to promise that Moeller would retire his 10 shares of stock. It does not appear that Halligan had any interest in such 10 shares, or any control of any kind over them, nor did he know of the representation made, if representation there was. Indeed, it is quite as clear that it was not a representation at all of an existing fact. It appears to have been a part of the plans discussed between Keeler and Pohlman as to their future operation of the company. There was no representation of any existing fact, nor is it claimed that there was any fraud even on the part of Keeler other than failure to perform his agreement, if any. The lack of substance in this part of the claim is further indicated by the fact that immediately after the acquisition of Halligan's stock, Keeler and Pohlman acquired the Moeller stock and issued the note of the company therefor without making any request upon Halligan and without notifying him at any time until the filing of this counterclaim of any alleged default in relation thereto. Moreover, Pohlman appears to have paid later his $2,500 note, without claiming any defense thereto. We think, therefore, that the evidence in this record did not justify a submission to the jury of this item upon a claim of false representations made by Keeler as agent for Halligan. In other respects, we have treated the allegations of the counterclaim as sufficient to present a case of false and fraudulent representations because they have been so treated in the discussion here. In view of a new trial, it may avoid future trouble to

note that the counterclaim contains no allegation of *scienter* or of actual fraudulent intent.

For the reasons indicated, a new trial must be awarded and it is so ordered. The judgment below is therefore— *Reversed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.